IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 21-cv-01813-PAB

VIOLETA DUMITRASCU, on behalf of A.M.B.D.,

     Plaintiff-Petitioner,

v.

ALIN DUMITRASCU,

     Defendant-Respondent.

---

## ORDER

---

     This matter is before the Court on the Verified Petition for the Immediate Return of the Minor Child to Romania Pursuant to 22 U.S.C. § 9001, *et seq.*, and the Hague Convention on the Civil Aspects of Child Abduction [Docket No. 1]. The Court held an evidentiary hearing on August 25, 2021. Both parties presented testimony and tendered exhibits. The Court has jurisdiction pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331.

## I. BACKGROUND

     Petitioner, a Romanian citizen, and respondent, a United States citizen, met online in 2007 and dated for eight years before marrying in 2015 in Romania. The couple moved to Colorado in 2016, and respondent successfully sponsored petitioner for a green card. While in Colorado, they lived at respondent's mother and step-father's house in Morrison, Colorado. Respondent "worked on a van," although it is unclear whether this was a paying job, and petitioner worked at a Chipotle restaurant.

In the late summer or early fall of 2019, petitioner and respondent traveled to Galati, Romania, where their daughter, A.M.B.D., was born on September 4, 2019. *See* Exh. 3. They chose to give birth in Romania in part because hospital costs for childbirth are free there and may have been unaffordable in Colorado. Petitioner, however, had some form of health insurance in the United States. Petitioner also wanted to give birth in Romania due to disagreements she had with her mother-in-law while in Colorado and in order to be close to her own family members in Romania after the birth. Both petitioner and respondent intended to return to the United States at some point to raise the child. The parties left certain belongings in Colorado, *see* Exh. C, and discussed returning there after A.M.B.D. was born.

Petitioner, respondent, and A.M.B.D. lived with respondent's father in Romania for ten months after A.M.B.D. was born. Petitioner breast fed A.M.B.D., the parties shared parenting responsibilities equally, and both were involved in her upbringing. Petitioner's family was not happy about petitioner's marriage at this point. Her family did not visit her in the hospital after the baby was born, but did spend holidays and special occasions with A.M.B.D. during the ten months that the child lived in Romania. When A.M.B.D. was five weeks old, petitioner got a job because someone had to earn money and respondent did not want to work in Romania. The family's belongings in Romania include clothing for A.M.B.D., a bicycle, a safe, a washing machine, and a car. Respondent used a credit card to pay expenses in Romania. His mother reimbursed some of these expenses.

While living in Romania, the parties' plan for the future diverged. Not long after A.M.B.D.'s birth, in October or November 2019, while the parties were living in

2

Romania, petitioner's green card expired.  In January 2020, the United States denied an extension of her green card.

Respondent believed that he needed to return to Colorado to work on getting his wife a green card and to obtain a Social Security card for A.M.B.D., which would help confirm her U.S. citizenship.  Petitioner also believed that it was not possible for her to apply for a green card from Romania.  The parties went to the U.S. Embassy in Romania to apply for a U.S. passport for the child.  Two weeks later, the child's passport was sent to them.  Respondent intended for the family to live in the United States eventually.  However, without a green card, petitioner was not sure if the family could live in the United States.  Petitioner testified that, had her green card been renewed on time, she may have traveled with respondent back to the United States, but their intentions were not set in stone because her green card had expired, relations with her mother-in-law in Colorado had soured, and petitioner noticed a change in respondent's behavior after their arrival in Romania in that respondent was unwilling to find a job there.  Moreover, while petitioner wanted her daughter to be a United States citizen, petitioner did not intend to be separated from A.M.B.D. for any substantial length of time.  She therefore made plans for the family to live in Romania.  She wanted the couple to apply for the First House program, a Romanian program to assist young families in buying their first home.  She applied for the program in March 2020, but respondent was not employed and they could not pay the interest on any loan. Therefore, the application was denied.  Moreover, respondent was not interested in the program.

Respondent insisted, however, that he travel to Colorado with A.M.B.D. in order

to apply for a Social Security card, during which process A.M.B.D. would need to be fingerprinted. He also planned to work on getting petitioner a green card, to bring her over to the United States, and to earn money through a job.

On June 15, 2020, petitioner and respondent visited a public notary in Galati, where petitioner signed an affidavit, drafted by the notary, that granted respondent permission to travel with A.M.B.D. to the United States from July 6, 2020 to December 31, 2020. Exh. 4. The translated version of the affidavit states, "I agree and consent, that my minor daughter, . . . to travel to the United States of America, starting with July 6, 2020, until December 31, 2020, together with Alin Dumitrascu, as parent of minor." *Id.* at 3. The parties discussed these dates before having the affidavit prepared as well as after they obtained the document.

The Court heard testimony from a practicing family law attorney in Romania, Christina-Mihaela Draghici-Nedelcu, who reviewed the June 15, 2020 affidavit as well as other documents in this case. Ms. Draghici-Nedelcu testified that, under Article 483 of the Romanian Civil Code, parental authority is jointly and equally held and must be exercised according to the child's best interest and her care, welfare, education, growth, and health.[1] In addition, both parents are responsible for the upbringing of the minor child. If the child does not live with both parents, Article 496 of the Romanian Civil

---

[1] Under Article 14 of the Convention, the Court "may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Convention, Art. 14. Ms. Draghici-Nedelcu opined on Romanian law as an expert witness in this case over respondent's objection under Federal Rule of Civil Procedure 702, and the Court admitted a portion of an exhibit containing provisions of the Romanian Civil Code into evidence. *See* Exh. 10 at 11–13.

Code requires joint decision-making by mutual agreement. The parent who the child does not live with has the right to visitation and to maintain a healthy relationship with the child. If the parents cannot reach a mutual agreement on an issue of custody, they must seek relief in a Romanian guardianship court, which is the only authority that can decide issues of custody. Additionally, Article 496 of the Romanian Civil Code forbids one parent from unilaterally changing the location of a child's home, which requires an order of the guardianship court. A unilateral custody decision is only permitted if the guardianship court decides that parental authority is not jointly held.

Ms. Draghici-Nedelcu explained that affidavits like the one petitioner signed are very common because they are required under a 2005 law for one parent to take a child out of the country. These temporary travel affidavits are written by notaries based on a form or model. Ms. Draghici-Nedelcu testified that Romanian courts strictly construe time limitations in such affidavits, and if a parent wishes to live abroad for more than three years or to permanently relocate to another country, the parties must obtain an order from the guardianship court. Therefore, Ms. Draghici-Nedelcu testified that, while the language of the affidavit may appear to provide permission for respondent to leave Romania with A.M.B.D. between July 6, 2020 and December 31, 2020, the affidavit must be "corroborated" with the laws of Romania and interpretation of Romanian courts, which would view the affidavit as providing respondent six months to travel with A.M.B.D. in the United States and then to return her to Romania. Ms. Draghici-Nedelcu opined that, under Romanian law, by respondent exceeding the time period agreed upon in the affidavit, respondent is wrongfully retaining the child and is preventing petitioner from exercising the joint parental authority that the law provides her. Ms.

5

Draghici-Nedelcu characterized taking A.M.B.D. out of Romania permanently to be a deliberate attempt of estrangement of the child and parental alienation, which Romanian courts consider to be a form of child abuse.

On July 8, 2020, respondent and his grandmother flew to the United States with A.M.B.D.  *See* Exh. A at 14–17.  Although respondent testified that he had pneumonia for eight months after he arrived in the United States, neither respondent nor his family in Morrison made any effort to help petitioner obtain a green card.  Respondent admitted that, during the six month period between July and December 2020, his family was paying $750 per month on a Mercedes van for him.  Respondent testified that he sponsored petitioner's green card, but otherwise it was her responsibility to obtain it.

Around November or December 2020, petitioner began to suspect that respondent would not return A.M.B.D. to Romania by the December 31 deadline.  On January 14, 2021, given that respondent did not return A.M.B.D., petitioner filed an application with Romanian authorities to secure A.M.B.D.'s return.  She filed for divorce in Romania in late May 2021 and filed this petition on July 2, 2021.

Since July 2020, petitioner's contact with A.M.B.D. has been limited to daily video calls.  She also testified that she was given access to the respondent's mother and step-father's home security cameras for two weeks.  Neither respondent nor his family in Colorado have taken A.M.B.D. to visit plaintiff in Romania.  Additionally, petitioner has not provided any financial support for A.M.B.D., although respondent testified that he asked petitioner to contribute.

## II.  ANALYSIS

The Hague Convention on the Civil Aspects of International Child Abduction (the

"Convention") was signed in 1980.[2]  The United States ratified the Convention and

implemented it in 1988 through the International Child Abduction Remedies Act

("ICARA"), 22 U.S.C. § 9001, *et seq.*, which provides that children under 16-years-old

"who are wrongfully removed or retained within the meaning of the Convention are to be

promptly returned unless one of the narrow exceptions set forth in the Convention

applies."  22 U.S.C. § 9001(a)(4); *see* also Convention, Art. 4.  Romania became a

signatory to the Convention in 1993.

"[T]he scope of a court's inquiry under the Hague Convention is limited to the

merits of the abduction claim."  *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001).  The

Court does not consider the merits of the underlying custody battle.  *See Watts v.

Watts*, 935 F.3d 1138, 1141 (10th Cir. 2019) ("At issue in this case is the . . .

determination concerning the location of the children's habitual residence."); *Seaman v.

Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014); *de Silva v. Pitts*, 481 F.3d 1279, 1285

n.6 (10th Cir. 2007) ("[T]he basic purpose and function of the Hague Convention and

ICARA [are to ensure that] the home country should make the custody determination

whenever possible." (quoting *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005)).

### A.  Petitioner's *Prima Facie* Case

To establish wrongful retention, petitioner here must make a *prima facie* case

consisting of three elements: (1) the child habitually resided in Romania at the time of

the retention, (2) such retention breached petitioner's custody rights under the law of

Romania, and (3) petitioner was exercising those rights at the time of retention.  *See In*

---

[2] Available at http://www.hcch.net/upload/conventions/txt28en.pdf.  References
to "Article," except where otherwise noted, refer to articles of the Convention.

*re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1033 (D. Colo. 2014) (citing

*West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013)); *see also* 22 U.S.C. § 9003(e)(1).

Petitioner has the burden to prove that the child has been wrongfully retained within the

meaning of the convention by a preponderance of the evidence.  22 U.S.C.

§ 9003(e)(1)(A).

### 1. Habitual Residence

#### a.  What is "habitual residence"?

"The Hague Convention does not define the term 'habitual residence.'"  *Monasky

v. Taglieri*, 140 S. Ct. 719, 726 (2020); *see also Pope ex rel. T.H.L-P v. Lunday*, 835 F.

App'x 968, 971 (10th Cir. 2020) (unpublished); *Holder v. Holder*, 392 F.3d 1009, 1015

(9th Cir. 2004).  "A child 'resides' where she lives.  Her residence in a particular country

can be deemed 'habitual,' however, only when her residence there is more than

transitory."  *Monasky*, 140 S. Ct. at 726 (citation omitted).  "The place where a child is at

home, at the time of removal or retention, ranks as the child's habitual residence."  *Id.*

"[L]ocating a child's home is a fact-driven inquiry," in which "courts must be sensitive to

the unique circumstances of the case and informed by common sense."  *Id.* at 727

(internal quotation marks omitted).  In *Monasky*, the Court rejected any "categorical

requirements for establishing a child's habitual residence."  *Id.* at 728.  Accordingly,

"[b]ecause children, especially those too young or otherwise unable to acclimate,

depend on their parents as caregivers, the intentions and circumstances of caregiving

parents are relevant considerations.  No single fact, however, is dispositive across all

cases."  *Id.*  Ultimately, the question is, "[w]as the child at home in the particular country

at issue?" *Id.* at 730.

Before *Monasky*, courts would generally first "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared." *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005); *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (en banc); *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) ("Before *Monasky*, the Fifth Circuit adopted an approach that looked to the parents' 'shared intent' as a threshold test for determining a child's habitual residence."). In determining intent, courts look at "actions as well as declarations." *Gitter*, 396 F.3d at 134.

*Monasky*, however, explained that, "if the parents' actual agreement on where to raise their child were necessary to establish a habitual residence, that 'would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected.'" *Pope*, 835 F. App'x at 970–71 (quoting *Monasky*, 140 S. Ct. at 728). Therefore, "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Monasky*, 140 S. Ct. at 729. A court also considers "where a child has lived, the length of time there, [and] acclimatization." *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) (unpublished) (citing *Monasky*, 140 S. Ct. at 729). Acclimatization is the inquiry "whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence." *Gitter*, 396 F.3d at 134; *see also Hofmann v. Sender*, 716

F.3d 282, 291–92 (2d Cir. 2013).

While shared intent is relevant, it is not dispositive, and it is not always easy to determine the parents' shared intent.  "Difficulty arises, of course, when the persons entitled to fix the child's residence no longer agree on where it has been fixed – a situation that, for obvious reasons, is likely to arise in cases under the Convention." *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 140 S. Ct at 730.  "In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is."  *Id.*; *see also Monasky*, 140 S. Ct. at 729.

Where the family has "manifested a settled purpose to change habitual residence," *Mozes* suggests that a court should find that the child's habitual residence has been changed, but where "the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period," then the habitual place of residence should not be found to have changed, unless that period of time is "too long to expect children to live abroad without acquiring habitual residence." *Id.* at 1076–77 & n.27.

In addition, where the parents intend that a child's relocation is conditional, such intent should not be deemed their last shared intent if the condition is not met.  *See Mota v. Castillo*, 692 F.3d 108, 115 (2d Cir. 2012).  If only one party has a conditional intent to relocate, "it cannot be said the parents 'shared an intent.'"  *See id.*; *see also Hofmann*, 716 F.3d at 293 (finding habitual residence was not United States where

intent to move "was limited by [petitioner's] conditional agreement that the relocation was to be accomplished as a family," but respondent unilaterally decided to move without petitioner); *Gitter*, 396 F.3d at 135 (finding no clear error in district court's determination that Israel was not habitual residence where respondent relocated "on a conditional basis – namely, that [respondent] would be satisfied with the new arrangements"); *Ruiz*, 392 F.3d at 1257 (holding mother did not abandon United States as habitual residence where her "intention with respect to the move to Mexico was clearly conditional upon improvements in their marriage, was expressed and in the open, and was well-known to [father]"); *Calixto v. Lesmes*, 909 F.3d 1079, 1089–90 (11th Cir. 2018) (holding, when "a parent's relocation with a child from one country to another [is] conditioned upon the occurrence of certain events, the first country [] remain[s] the child's habitual residence if those events did not come to pass"); *Guzzo*, 719 F.3d at 111 (finding habitual residence did not change from United States to Italy where, among other things, the mother's "willingness to attempt a reconciliation in Italy was clearly premised on the understanding that, should the reconciliation prove unsuccessful," the child would continue to reside in the United States); *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009) (collecting cases where "courts have refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis"); *Papakosmas v. Papakosmas*, 483 F.3d 617, 625 (9th Cir. 2007) (affirming district court finding that parents did not have a shared intent to change habitual residence because "the family's move to Greece was 'conditional'").

### b. Where was A.M.B.D.'s habitual residence at the time of her retention?

In this case, the parties dispute whether the United States or Romania was A.M.B.D.'s habitual residence at the time of her retention. The Court first looks to the parties' intent, among other factors. The Court finds that, when the parties traveled to Romania for the birth in August 2019, their intent was to return as a family to the United States. The evidence reflects that the couple left personal belongings at respondent's mother and step-father's house in Colorado, including clothing, documents, and other personal items, *see* Exh. C, and respondent's witnesses testified that the parties had planned on returning to Colorado and raising a family there. The Court finds that these facts support a conclusion that the parties' shared intent before A.M.B.D.'s birth was to return to Colorado.

While the parties' shared intent before the birth was to return to Colorado, shared intent is not dispositive of habitual residence, *see Monasky*, 140 S. Ct. at 728, and there are no "categorical requirements" for determining habitual residence. *See id.* at 730; *see also Pope*, 835 F. App'x at 970–71 (actual agreement is not necessary for habitual residence). Because determining habitual residence is a "fact-driven inquiry," the Court, must consider other evidence, that may indicate that "the parents have made their home in a particular place," which "can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Monasky*, 140 S. Ct. at 727–29.

When the parties were in Romania, the facts indicate that matters changed. In October, just five weeks after giving birth, petitioner had to return to work because

respondent was unwilling to find a job.  Then, in November, petitioner's green card

expired and she could not return to the United States.  When asked whether, once in

Romania, there was a plan for the family to settle in the United States permanently,

petitioner testified that their intentions were not set in stone because her green card

had expired and that the couple was unsure whether they would live in Romania or the

United States.  When asked whether she would have returned to Colorado had her

green card not expired, petitioner testified that she was not sure if she would have

because of her relationship with her mother-in-law.  Not only did petitioner continue to

work in Romania, but she also investigated the First House program and applied in

March 2020, hoping to buy a house in Romania, evincing an intent to stay there with

respondent and A.M.B.D.  The parties acquired clothing for A.M.B.D., a bicycle, a safe,

a washing machine, and a car.  Furthermore, the family remained in Romania for ten

months, far longer than it took to take advantage of the lack of hospital costs associated

with childbirth.  The family also celebrated holidays with both sides of A.M.B.D.'s family.

These facts support a finding that A.M.B.D.'s habitual residence at the time of her

removal to the United States on July 8, 2020, and subsequent retention in the United

States, was Romania.  While respondent may have intended that the family live in the

United States permanently, that was only possible if he succeeded in obtaining a green

card for petitioner.  The Court finds that the parties never had a shared, mutual intent to

live apart.

　　　　The Court finds further support that A.M.B.D.'s habitual residence at the time of

her retention was Romania in the facts and circumstances surrounding the affidavit that

the parties had prepared in June 2020.  The Court adopts the interpretation of the

affidavit expressed by Ms. Draghici-Nedelcu and that is consistent with Romanian law, namely, that the affidavit provided petitioner's conditional, time-limited consent for respondent to travel to the United States with A.M.B.D. from July 6, 2020 to December 31, 2020, after which time respondent had to return A.M.B.D. to Romania.

The Court notes that respondent's interpretation of the affidavit at the hearing, which was that the affidavit provided him a window of time to leave the country with no requirement to return the child to Romania, was discredited by Ms. Draghici-Nedelcu because it is inconsistent with Romanian law.  Moreover, if it was respondent's intention to leave Romania with A.M.B.D. permanently, the affidavit, even if it could provide such authority, would have been written differently.  Specifically, there would have been no reason for the notary or petitioner to provide a date range, July 6, 2020 to December 31, 2020, for respondent to leave as opposed to simply providing respondent with permission to leave on or after a given date.

While respondent testified that he did not read the affidavit and was unaware of its time restrictions, the Court does not find his testimony on this issue credible. Respondent testified that he insisted on obtaining the affidavit, which he thought was necessary to travel internationally with A.M.B.D. when A.M.B.D.'s mother did not accompany them, and he traveled in reliance on it.  Respondent was aware that the document might be checked at the Romanian airport when he departed Romania with A.M.B.D.  The Court finds that the affidavit is a reflection of petitioner's conditional permission that respondent could travel to the United States with A.M.B.D. for six months and petitioner's unwillingness to consent to A.M.B.D.'s permanent relocation in Colorado.  The affidavit is, therefore, fundamentally inconsistent with a shared intent for

14

A.M.B.D. to live permanently in the United States.

The conclusion that the consent contained in the affidavit was conditional is made apparent in the parties' testimony that the purpose of respondent and A.M.B.D.'s travel was to obtain a Social Security card for A.M.B.D., to obtain a green card for petitioner,[3] and for respondent to find a job and save money.[4]  Additionally, petitioner testified that she believed that it was not possible for her to apply for a green card from Romania and that respondent sponsored her first green card from Colorado, which explains why she made her permission for respondent to remove A.M.B.D. from Romania conditional: she was otherwise helpless if respondent did not obtain a green card for her.  Petitioner also testified that the six-month conditional consent was the parties' verbal agreement, which they discussed before, during and after obtaining the affidavit.  Thus, although petitioner had consented to A.M.B.D.'s temporary removal to the United States, her consent was dependent on respondent obtaining citizenship and a Social Security number for the child, a green card for petitioner, and the respondent working.  When he failed, at a minimum, to obtain a green card for petitioner in the six months that petitioner gave him, the conditions were not met, the consent expired, and A.M.B.D.'s retention in the United States was wrongful.

---

[3] Respondent testified that he did not make any progress on obtaining petitioner's green card.  This admission is inconsistent with a shared intent for the family to relocate to the United States, which would have required petitioner to have a green card.

[4]  When asked on direct examination why respondent left Romania, he stated that it was to apply for Social Security benefits and to file paperwork on petitioner's behalf, which does not indicate any shared intent to permanently stay in Colorado or for an American habitual residence for A.M.B.D.

In reaching the conclusion that petitioner's consent for A.M.B.D. to leave Romania was conditional, the Court finds the reasoning in *Calixto* and *Mota* to be informative.  In *Calixto*, the court noted that the father signed a travel consent form, much like the affidavit here, providing the mother one year to travel with the child to the United States.  *See* 909 F.3d at 1086.  The travel consent form "indicated 'November 2015' as the 'date of departure from the country of the child,' and 'November 2016' as the 'date of return or entry into the country of the child.'"  *Id.*  The court also explained that the travel consent form may have been conditioned on the father's ability to live in the United States legally.  *Id.* at 1091 ("the intent to change the habitual residence of a child from one country to another can be conditioned on the ability of one parent to be able to live in the new country with the child").  Although there was no indication in the travel consent form that the consent was conditional, *see Calixto v. Lesmes*, 2017 WL 9401117, at *2 (M.D. Fla. Oct. 19, 2017), *report and recommendation adopted*, 2017 WL 5167492 (M.D. Fla. Nov. 8, 2017), it was also possible, the Eleventh Circuit held, for the conditional intent to be expressed in the travel consent form.  *Calixto*, 909 F.3d at 1091 ("In our view, there is no reason why such a conditional intent cannot be expressed in a document that permits the child to travel to her new country for a limited period of time.  To the extent that the district court here believed that the travel consent form executed by Mr. Calixto could not render his intent about [the child's] habitual residence in the United States conditional . . . it was mistaken.").

In *Mota*, the father traveled from Mexico to New York to find work, leaving behind his wife and infant daughter.  692 F.3d at 109–10.  Three years later, the mother and

father arranged for the daughter to be smuggled into the United States to join the father, with the mother following later. *Id.* The mother, however, was arrested and deported back to Mexico. *Id.* at 110. The court found that the plan for the mother to join the family in New York "had been, and would continue to be, frustrated." *Id.* at 111. The father, however, refused to return the child to Mexico, arguing that it was the parties' settled intent that the daughter move to the United States. *Id.* at 111, 114. The mother did not disagree that was the plan, but stressed that her agreement was contingent on her being able to join the father and daughter. *Id.* at 114. The father disputed that there were any conversations conditioning the daughter's relocation to New York. *Id.* The court held that "it was more likely than not that [the mother] intended for [the daughter] to live in the United States *only if* she herself could join the household and continue to raise her child." *Id.* at 115. The mother was the child's primary caretaker for the first few years of her life, made repeated attempts to enter the United States, timely demanded that the father return her daughter when her attempts to enter failed, sought help from Mexican authorities, and ultimately filed a petition under the Convention. *Id.* at 114–15. In addition, the mother testified that she never intended for her daughter to live permanently in the United States without her, but "always intended for [her daughter] to be by her side." *Id.* at 115.

 This case is even clearer than *Mota*. In *Mota*, the mother did not disagree that the parties' plan was for her to join the father and daughter in the United States, *id.* at 114, while here, the mother testified that the plans were uncertain. Additionally, while in *Mota* the mother agreed with the plan for the daughter to live in the United States, but

conditioned agreement on her own ability to emigrate, in this case petitioner never agreed that A.M.B.D. could remain in the United States indefinitely.  Instead, petitioner's conditional consent was limited to six-months.  Finally, in this case, the parties planned that respondent would obtain a green card for petitioner to join respondent and the child in the United States; however, similar to what happened in *Mota*, when that did not occur, petitioner timely demanded that respondent return A.M.B.D. to Romania, sought assistance from Romanian authorities two weeks later, and then filed this petition.  Petitioner also testified that she never intended to be separated from her daughter, as evidenced by the affidavit, indicating that, even if the parties intended to return to Colorado when they went to Romania, there was never, either in Colorado or Romania, any shared intent for the family to be separated.  These facts outweigh the parties' pre-birth intent to return to Colorado and, instead, establish that A.M.B.D. was "at home" in Romania when she was wrongfully retained.  *See Monasky*, 140 S. Ct. at 730.

The Court notes that, "in determining a habitual residence," the Court "must focus on the conduct of both of the parents and not the future intentions of one of the parents."  *In re Morris*, 55 F. Supp. 2d 1156, 1161 (D. Colo. 1999) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993); *Feder v. Evans-Feder*, 63 F.3d 217, 223 (3d Cir. 1995); *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1285 (S.D. Fla. 1999)).  Respondent's arguments, however, do not lead the Court to a different conclusion.  For instance, the fact that the parties left belongings in Colorado and had plans to return to Colorado is less meaningful when considered with the fact that the parties also have

belongings in Romania, including a washing machine, a car, a bicycle, and clothing for A.M.B.D. Moreover, as noted above, the parties' pre-birth intent is outweighed by their intent and conduct thereafter. Respondent's argument that petitioner allowed him to leave Romania with A.M.B.D. is also not persuasive given that her permission was conditional and time-limited. Similarly, respondent's testimony that he and petitioner only traveled to Romania for the low childbirth costs is unconvincing given the duration of their stay in Romania after A.M.B.D.'s birth. Finally, while the facts that respondent did not work in Romania, his mother and step-father made his car payments, and he paid bills with credit cards may indicate that respondent viewed his time in Romania as temporary, respondent is not working now and his mother and step-father are still making his car payments, suggesting these things have little to do with where respondent intended the family to live while in Romania. Ultimately, none of these facts alter the Court's conclusion that A.M.B.D. was "at home" in Romania when she was taken to the United States.

As the Ninth Circuit has noted, "where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period," "courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Mozes*, 239 F.3d at 1077. Keeping the admonition of *Monasky* in mind about not applying categorical tests, the Court nevertheless finds the analysis helpful here. The six-month period identified in the affidavit was a temporary, "delimited period," as there was no shared, settled intention for A.M.B.D. to permanently live in Colorado without her mother. *See id.* (citing *Pesin v. Rodriguez*, 77 F. Supp. 2d 1277, 1285 (S.D. Fla. 1999) (settled purpose

19

of family trip was a vacation of finite duration); *Morris*, 55 F. Supp. 2d. at 1159 (when family left Colorado for school-year teaching appointment in Switzerland, the parties had a "shared, settled intention to return to Colorado with the child," and mother's unilateral change of position could not make Switzerland the habitual residence); *Freier v. Freier*, 969 F. Supp. 436, 438 (E.D. Mich. 1996) (when mother left with child, she informed father that she would be vacationing with parents for one month); *Flores v. Contreras*, 981 S.W.2d 246, 248 (Tex. App. 1998) (mother brought child to Texas for two-week vacation); *Brennan v. Cibault*, 227 A.D.2d 965, 965 (N.Y. App. Div. 1996) (mother agreed that child should remain with father in New York for six months, but expected her to return to France on a specific date).

To the extent respondent argues that cases like *Morris* support his position, the Court disagrees.  In *Morris*, an Irish-American father and German mother had a child in Colorado and, when the child was an infant, the family went to Switzerland for ten months for a teaching appointment for the father.  55 F. Supp. 2d at 1158–59.  The parents had a shared intention to return to Colorado when they left for Switzerland; however, the marriage began to deteriorate while abroad.  *Id.* at 1159–60.  Worried that the mother would intend to stay in Switzerland or Germany after the school year and would obtain a custody order from a Swiss or German court, the father returned to Colorado with the child without the mother's knowledge.  *Id.* at 1160.  The court found that the child's habitual residence remained in Colorado and that his removal was not wrongful.  *Morris* is not like this case for a few reasons.  First, the parties in *Morris* had almost no connection to Switzerland; the child was born in Denver, neither parent was a

Swiss citizen, and the child was only present in Switzerland for 104 days of his 205 days away from Colorado.  *See id.* at 1161.  In this case, the petitioner and respondent are Romanian by birth, and A.M.B.D. was born there and lived there for ten months before she was removed and subsequently retained in the United States.  Second, in *Morris*, the parties left Colorado for a delimited period for a specific purpose, while, in this case, they left Colorado for no specific period of time and, when respondent returned to Colorado with his child, petitioner intended and respondent understood that respondent would return to Romania with A.M.B.D. after six months.  Third, in *Morris*, the mother unilaterally decided to stay in Switzerland, while in this case, petitioner did not act unilaterally but rather gave respondent conditional, time-limited consent to travel for a specific purpose, which respondent acted in reliance upon when he removed A.M.B.D. from Romania.

For these reasons, the Court concludes that A.M.B.D.'s habitual residence at the time of her retention was Romania.  A.M.B.D. was born in Romania and lived there for ten months before her removal to the United States.  A.M.B.D. was allowed to leave Romania only based on the conditional approval of petitioner, who could not accompany her husband and daughter due to her lack of a green card.  The parties never intended to be apart, and the only place that they can be together, without a new green card for petitioner, is Romania.

### 2.  Petitioner's Custody Rights

The second element of the *prima facie* case is a breach of the remaining parent's custody rights.  "[C]ustody of a child entails the primary duty and ability to

choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical

attention, education, etc., or the (revocable) selection of other people or institutions to

give these things." *Croll v. Croll*, 229 F.3d 133, 138 (2nd Cir. 2000), *abrogated on other

grounds by Abbott v. Abbott*, 560 U.S. 1 (2010); *see also Furnes v. Reeves*, 362 F.3d

702, 716 (11th Cir. 2004) ("The right to determine a child's language, nationality, and

cultural identity is plainly a right relating to the care and person of the child within the

meaning of the Convention") (internal quotations omitted), *abrogated on other grounds

by Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

The parent need not have sole or even primary custody to have rights under the

Convention. *Furnes*, 362 F.3d at 715. "In analyzing whether a parent has custodial

rights under the Hague Convention, it is crucial to note that the violation of a single

custody right suffices to make removal of the child wrongful. That is, a parent need not

have 'custody' of the child to be entitled to return of his child under the Convention;

rather, he need only have one right of custody." *Id.* While many courts have placed

particular emphasis on a parent's right to determine the child's place of residence when

examining whether a parent has rights of custody, the Convention also states that

"rights of custody" shall include rights relating to the care of the child. *See Lieberman v.

Tabachnik*, 625 F. Supp. 2d 1109, 1119 (D. Colo. 2008); Convention, Art. 5(a) (defining

"rights of custody" as "relating to the care of the person of the child and, in particular,

the right to determine the child's place of residence"). When no formal custody

agreement exists between the parents, the Court must apply the laws of the country of

the child's habitual residence to determine if the non-removing parent had "rights of

custody" within the meaning of the Convention.  *See, e.g.*, *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004).  "The Convention is very clear that the law of the country in which the child was habitually resident governs the decision as to whether custody rights existed at the time of removal."  *Shealy v. Shealy*, 295 F.3d 1117, 1124 (10th Cir. 2002).  As such, the Court looks to Romanian law.

Ms. Draghici-Nedelcu testified that the Romanian Civil Code provides that parental authority is to be exercised jointly according to the child's best interest.  *See also* Exh. 10 at 13.  If the child does not live with both parents, custody decisions must still be made mutually by joint decision-making or, if that is not possible, by the guardianship court, which is the only authority that can decide issues of custody in the absence of parental agreement.  Moreover, Article 497 of the Romanian Civil Code states that, "[i]f it affects the exercise of authority or parental rights, the change of the child's home, together with the parent where he/she lives, may take place only with the prior consent of the other parent" or the guardianship court.  *Id.*

The Court finds that petitioner's custody rights, under the laws of Romania, were violated by respondent's unilateral retention of A.M.B.D. in the United States after December 31, 2020.  Respondent has further violated petitioner's custodial rights by his claim of a right not to return A.M.B.D. given that only a Romanian family law court can allow a child's permanent relocation outside of Romania.  Additionally, while she appears to have been able to communicate with her daughter on video chat and had access to respondent's home security cameras for a period of time, petitioner has not seen her daughter in-person since July 2020, and there is no indication that she has been permitted to exercise any joint authority or decision-making since A.M.B.D. was

23

removed from her habitual residence.

### 3.  *Petitioner's Exercise of Custody Rights*

The third prong of the *prima facie* case is that the petitioner was exercising her custody rights at the time of the wrongful retention.  "[A] person cannot fail to 'exercise' [her] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.  Once it determines that a parent exercised custody rights in any manner, the court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly."  *Stead*, 77 F. Supp. 3d at 1035 (quoting *Friedrich*, 78 F.3d at 1066).

The evidence confirms that petitioner was exercising her custody rights under Romanian law before her child was wrongfully retained.  With respect to petitioner's actions after respondent and A.M.B.D. left Romania, petitioner has continued to attempt to exercise her custodial rights abroad through daily video calls and, for a time, watching her daughter on the mother- and step-father-in-law's home's surveillance system.  While respondent argued at the hearing that petitioner has not financially contributed to A.M.B.D.'s care since she was taken to Colorado, even though he has asked for support, this testimony does not change the Court's determination that petitioner was exercising her custody rights while the child was in her care and does not constitute the sort of "clear and unequivocal abandonment" required to find in respondent's favor on this element of plaintiff's *prima facie* case.  *See Friedrich*, 78 F.3d at 1066.  The Court notes that petitioner is working as a cook's assistant and may not have substantial financial resources to send to the United States, while respondent

and his family are able to provide financial resources for the child, despite the fact that respondent has not worked steadily since he arrived in Colorado July 2020.  *See* Exh. B.

The Convention provides that retention of a child is wrongful if, at the time of retention, petitioner was either exercising her custodial rights or if those rights "would have been so exercised but for the removal or retention."  Convention, Art. 3(b). Petitioner argues, and the Court agrees, that evidence shows that petitioner intended to resume her role as A.M.B.D.'s caregiver upon her return to Romania.

For the foregoing reasons, the Court finds that petitioner has satisfied her *prima facie* case under the Convention.

### B.  Respondent's Defenses

Having determined that petitioner has met her burden, the Court now considers whether any of the four possible exceptions or defenses applies.  Courts have held that such exceptions must be narrowly construed.  *See West*, 735 F.3d 929; *Avila v. Morales*, No. 13-cv-00793-MSK-MEH, 2013 WL 5499806, at *13 (D. Colo. Oct. 1, 2013) (citing *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007)).  Two of the available defenses must be established by a preponderance of the evidence: (1) the proceeding was commenced more than one year after the child's retention and the child has become settled in her new environment, *see* Convention, Art. 12; or (2) the parent seeking return of the child either consented to or subsequently acquiesced in the retention.  *See* Convention, Art. 13; *see Gil-Leyva v. Leslie*, No. 17-cv-01406-KLM, 2018 WL 10322064, at *4 (D. Colo. Apr. 17, 2018), *aff'd*, 780 F. App'x 580 (10th Cir.

2019) (unpublished) (citing *Crane v. Merriman*, 2017 WL 4079406, at *5 (W.D. Okla. Sept. 14, 2017)).  The other two defenses require proof by clear and convincing evidence: (3) there is a grave risk that the return of the child would expose her to physical or psychological harm, *see* Convention, Art. 13(b); or (4) "the return of the child[] would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  *See Gil-Leyva*, 2018 WL 10322064, at *4 (citing Convention, Art. 20); *Crane*, 2017 WL 4079406, at *5. The Court considers the first three defenses.  The Court does not consider the last defense, which is called the public policy defense, because "it is so rarely invoked that it is considered to have 'nearly faded without a trace.'"  *See Filho v. de Albuquerque*, No. 20-cv-01421-RBJ, 2020 WL 9455201, at *7 (D. Colo. Aug. 21, 2020) (quoting Beaumont, P.R. & McEleavy, P.E., *The Hague Convention on International Child Abduction* 172 (1999)).

### 1. Well-Settled

The "now-settled" or "well-settled" defense is found in Article 12 of the Convention, which states, in relevant part, that the Court, "even where the proceedings have been commenced after the expiration of the period of one year . . . , shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment."  Convention, Art. 12.  This defense "is applicable only if more than one year has elapsed from the wrongful removal before the date of commencement of these proceedings."  *In re Robinson*, 983 F. Supp. 1339, 1344–45 (D. Colo. 1997). *Robinson* held that proving this defense requires "substantial evidence of the child's

significant connections to the new country." *Id.* at 1344 (quoting *Hague International Child Abduction Convention; Text & Legal Analysis*, 51 Fed. Reg. 10509). There are, therefore, two relevant factors to this defense – the passage of time and the age of the child, i.e., whether the child is old enough to develop meaningful connections to the new environment. *Robinson*, 938 F. Supp at 1345–46. "[C]ourts have held that this defense is intended to pertain to a situation in which a child is abducted in infancy, and an application is filed after so long that it becomes impossible to deny the child's acclimation." *Filho*, 2020 WL 9455201, at *8 (citing *Gitter*, 396 F.3d at 133).

Respondent argues that A.M.B.D. has acclimated to life in the United States because she has many fond memories of life in Colorado as well as flourishing connections to the community. *See, e.g.*, Docket No. 23 at 4. Respondents' witnesses also presented testimony that A.M.B.D. has had a happy childhood with her father and grandparents in Colorado. Petitioner does not appear to dispute this and presented no evidence to the contrary. The Court agrees that the child is doing well in Colorado. The Court must be careful, however, not to engage in a best interests of the child inquiry, as a Colorado state court would do in a typical domestic relations case, or try to determine where A.M.B.D. would be better off. *See Dawson v. Dylla*, No. 21-cv-00283-RBJ, 2021 WL 1534608, at *4 (D. Colo. Apr. 19, 2021). "'[W]ell-settled' means more than having a comfortable material existence." *See Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998); *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1259–60 (M.D. Fla. 2008). "Issues 'underlying the custody dispute are presumptively to be adjudicated in the place of the child's habitual residence.'" *Dawson*, 2021 WL 1534608, at *4 (quoting

*McManus v. McManus*, 354 F. Supp. 2d 62, 69 (D. Mass. 2005)).

Respondent, however, has not met his burden under the well-settled defense. First, respondent has provided no evidence or argument that this proceeding was commenced more than one year after the wrongful retention.  When faced with a dispute over when a wrongful retention occurred, courts "analyze the date of retention by determining either the date when the petitioner becomes aware of the respondent's intention not to return the child," *Cunningham v. Cunningham*, 237 F. Supp. 3d 1246, 1280 (M.D. Fla. 2017) (citing *Dietz v. Dietz*, 349 F. App'x. 930, 933 n.2 (5th Cir. 2009) (unpublished), *aff'd*, 697 F. App'x 635 (11th Cir. 2017) (unpublished)), or the date when the petitioner unequivocally communicated to the respondent his or her desire to regain custody.  *Id.* at 1280 (citing *Walker v. Walker*, 701 F.3d 1110, 1118 (7th Cir. 2012); *Karkkainen*, 445 F.3d at 290.  Even assuming the wrongful retention occurred as early as July 8, 2020, when respondent left Romania with the child, petitioner filed her application with Romanian authorities for relief under the Convention on January 14, 2021 and her petition with this Court on July 2, 2021, *see* Docket No. 1, which were both within one year.  The now-settled defense, therefore, does not apply.

Second, even if the petition were not filed within a year of the wrongful retention, respondent's evidence of A.M.B.D.'s acclimatization is insufficient.  When the defense applies, courts "consider the following factors in determining whether a child is settled in a new environment: '(1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the

child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.'"  *Cunningham*, 237 F. Supp. 3d at 1282 (quoting *Fuentes-Rangel v. Woodman*, 617 F. App'x. 920, 922 (11th Cir. 2015) (unpublished) (quoting *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009))); *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1349 (S.D. Fla. 2002) (concluding that the child was not settled, in part, because the parent's employment history was not stable); *In re Koc*, 181 F. Supp. 2d 136, 153–54 (E.D.N.Y. 2001) (considering unstable employment and child's attending multiple daycare centers); *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (considering family's fluency in English).

Respondent has provided no evidence that A.M.B.D. has developed any connections to the community outside of her family.  For instance, there are no records of her day care attendance or relationships with friends.  In addition, respondent's employment history does not appear stable or consistent, and the family speaks Romanian and English at home, even though respondent has lived in the United States for 15 years.  Thus, it would not be destabilizing for A.M.B.D. to be returned to Romania.  Moreover, A.M.B.D. is barely two-years-old, and courts almost uniformly hold that "children of such tender years are too young 'to allow meaningful connections to the new environment to evolve.'"  *Cunningham*, 237 F.  Supp. 3d at 1282 (citing *Moreno v. Martin*, 2008 WL 4716958, at *21 (S.D. Fla. Oct. 23, 2008) (collecting cases) (quoting *Robinson*, 983 F. Supp. at 1345)); *see also Riley v. Gooch*, 2010 WL 373993, at *11 (D. Or. Jan. 29, 2010) (noting that the court was unable to find any case in which a

court refused to return a two-year-old child based on the well-settled defense); *Habrzyk v. Habrzyk*, 775 F. Supp. 2d 1054, 1066–68 (N.D. Ill. 2011) (rejecting well-settled defense where four-year-old was living in a comfortable and stable home and had close relationships with her relatives, but no connections to community); *Blanc v. Morgan*, 721 F. Supp. 2d 749, 764 (W.D. Tenn. 2010) (finding four-year-old child was not well-settled despite respondent's stable home and employment, and child's regular day care attendance, family vacations and bond with family because no substantial evidence of child's ties to community); *Riley*, 2010 WL 373993, at *11 (declining to apply well-settled defense although child had lived in same residence with grandparents for a year, consistently attended day-care, spoke English and had close relationship with respondent-father, because child had not developed such significant connections to the United States that return would be harmfully disruptive); *In re Hague Child Abduction Application*, 2008 WL 913325, at *11 (D. Kan. Mar. 17, 2008) ("[A]t her young age, [the six-year-old child] is adaptable."); *cf. Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003) (noting that a certain age may be required for a child to become settled and finding that at the age of nine a child was "now old enough to experience meaningful ties with the United States").

The Court therefore does not find that respondent has carried his burden in establishing that A.M.B.D. has been in Colorado "so long that it [has] become[] impossible to deny [her] acclimation."  *See Filho*, 2020 WL 9455201, at *8 (citing *Gitter*, 396 F.3d at 133).

### 3. Consent or Acquiescence

Article 13(a) of the Convention provides that the Court is not bound to order the return of the child if petitioner "consented to or subsequently acquiesced in the removal or retention." Convention, Art. 13. Respondent bears the burden to prove that petitioner consented or acquiesced by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). This exception can apply where the record reflects "a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070; *Filho*, 2020 WL 9455201, at *8; *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1358 (M.D. Fla. 2002) (rejecting authorization to travel to the United States for vacation as "consent").

Aside from his argument that the affidavit provided only a window of time to leave Romania and that the couple had a shared intention to raise A.M.B.D., which the Court has already considered, respondent provides no evidence or argument that petitioner consistently acquiesced or consented over time to the retention of A.M.B.D. in the United States beyond December 31, 2020. Just two weeks after the December 31 deadline passed, petitioner filed an application under the Convention with the Romanian authorities. The Court concludes that petitioner acted with reasonable diligence to secure A.M.B.D.'s return after discovering respondent's intention to retain A.M.B.D. in the United States and that respondent cannot meet his burden of establishing acquiescence by a preponderance of the evidence.

### 3. Grave Risk

The grave risk defense provides that a child wrongfully removed from her

habitual residence or retained should not be returned where there is a grave risk that the return would expose the child to physical or psychological harm or "otherwise place the child in an intolerable situation."  *Gil-Leyva*, 2018 WL 10322064, at *5; *Crane*, 2017 WL 4079406, at *5; *West*, 735 F.3d at 931.  "Grave risk" means that the "potential harm to the child must be severe, and the level of risk and danger . . . very high."  *West*, 735 F.3d at 931 (quoting *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013)).  The Tenth Circuit has noted that the grave risk exception applies in two primary circumstances.  First, a court should not return a child to "a zone of war, famine, or disease."  *Id.* at 931 n.8.  Second, a court should not return a child to a place that the child would face "serious abuse or neglect, or extraordinary emotional dependence when the country of habitual residence for whatever reason may be incapable or unwilling to give the child adequate protection."  *Id.* (citing *Baxter  v. Baxter*, 423 F.3d 363, 373 (3d Cir. 2005); *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001); *Friedrich*, 78 F.3d at 1069).

Neither type of grave risk applies here, and respondent has provided no testimony that A.M.B.D. would face any type of risk or harm if returned to Romania.  Rather, the evidence is clear that she would be returned to a loving mother and an extended family that would look after her.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Verified Petition for the Immediate Return of the Minor Child to Romania Pursuant to 22 U.S.C. § 9001, *et seq.*, and the Hague Convention on the Civil Aspects of Child Abduction [Docket No. 1] is **GRANTED**.  It is further

**ORDERED** that respondent shall ensure that A.M.B.D. is on a flight to Romania, accompanied by an appropriate caregiver, with the right to travel internationally with A.M.B.D. outside of the United States, departing on or before October 9, 2021.  It is further

**ORDERED** that, no later than seven days before the date of A.M.B.D.'s departure for Romania, respondent shall file under Level One restriction in this case a notice that informs petitioner of the details of A.M.B.D.'s return flights to Romania and with whom she will be traveling.  It is further

**ORDERED** that petitioner may file a post-judgment motion for the allocation of costs and expenses consistent with the procedures set forth in Federal Rule of Civil Procedure 54(d)(1) and D.C.COLO.LCivR 54.1.  It is further

**ORDERED** that this case is closed.


DATED September 15, 2021.



BY THE COURT:



PHILIP A. BRIMMER
Chief United States District Judge