IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 21-cv-01813-PAB

VIOLETA DUMITRASCU, on behalf of A.M.B.D.,

    Plaintiff-Petitioner,

v.

ALIN DUMITRASCU,

    Defendant-Respondent.

_____

**ORDER**
_____

This matter is before the Court on the Emergency Motion for Stay Pending Respondent's Appeal [Docket No. 34] filed by respondent.  Respondent seeks a stay of the Court's September 15, 2021 order, Docket No. 27, granting the petition for the immediate return of the minor child, A.M.B.D. [Docket No. 1].  Petitioner responded to the motion.  Docket No. 46.  Respondent replied.  Docket No. 47.

**I. BACKGROUND**

The background facts are set forth in the Court's September 15, 2021 order, *see* Docket No. 27 at 1–6, and will not be repeated here except as necessary to resolve respondent's motion.

**II. LEGAL STANDARD**

The power to grant a stay pending appeal is "part of a court's 'traditional equipment for the administrative of justice.'"  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted).  It is "firmly imbedded in our judicial system, . . . and a power as old

as the judicial system." *Id.* (citation and quotation omitted).  The power to "hold an order in abeyance" is "inherent." *Id.* at 426–27.  However, a court "may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review." *Id.* at 427.  This is because a "stay is an intrusion into the ordinary processes of administrative and judicial review . . . and accordingly is not a matter of right, even if irreparable injury might otherwise result." *Id.* (citations and quotations omitted).  "The parties and the public, while entitled to both careful review and a meaningful decision, are also generally entitled to the prompt execution of orders." *Id.*  A stay is characterized as "'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* at 433 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

The factors governing issuance of a stay pending appeal are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also* 11 *Fed. Prac. & Proc.* § 2904.  There is substantial overlap between these and the factors governing preliminary injunctions "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken*, 556 U.S. at 434; *see also Warner v. Gross*, 776

F.3d 721, 728 (10th Cir. 2015). "The first two factors of the traditional standard are the most critical," as "more than a mere possibility of relief is required" and "showing some possibility of irreparable injury fails to satisfy the second factor." *Nken*, 556 U.S. at 434–35 (internal citations, quotations, and alterations omitted).

## III. ANALYSIS

Respondent argues that the four factors enumerated in *Hilton* weigh in favor of granting his motion to stay this case pending resolution of his appeal in the Tenth Circuit. Docket No. 34 at 4.

As the Court noted in the order granting the petition, "the scope of a court's inquiry under the Hague Convention (the "Convention") is limited to the merits of the abduction claim." Docket No. 27 at 7 (quoting *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001)). The Court does not consider the merits of the underlying custody battle. *Id.* (citing *Watts v. Watts*, 935 F.3d 1138, 1141 (10th Cir. 2019) ("At issue in this case is the . . . determination concerning the location of the children's habitual residence."); *Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014); *de Silva v. Pitts*, 481 F.3d 1279, 1285 n.6 (10th Cir. 2007) ("[T]he basic purpose and function of the Hague Convention and ICARA [are to ensure that] the home country should make the custody determination whenever possible." (quoting *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005))).

The Court previously explained that, to establish wrongful retention, petitioner had to show a *prima facie* case consisting of three elements. *Id.* at 7–8. These elements are: (1) the child habitually resided in Romania at the time of the retention, (2)

3

such retention breached petitioner's custody rights under the law of Romania, and (3) petitioner was exercising those rights at the time of retention. *Id.* (citing *In re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1033 (D. Colo. 2014) (citing *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013)); 22 U.S.C. § 9003(e)(1)). The Court noted that petitioner had the burden to prove that the child was wrongfully retained within the meaning of the convention by a preponderance of the evidence. *Id.* at 8 (citing 22 U.S.C. § 9003(e)(1)(A)).

Respondent's motion is limited to the Court's determination of the habitual residence of the minor child, A.M.B.D. *See generally* Docket No. 34. Respondent does not challenge the Court's determination that respondent's wrongful retention breached petitioner's Romanian custody rights, that petitioner was exercising those custody rights at the time of A.M.B.D.'s retention, or that respondent failed to establish any affirmative defense. *Id.* Although respondent mentions "other appealable issues," *see id.* at 10 n.5, these purported "issues" are listed in a footnote with no elaboration, factual development, or argument. As such, the Court will not consider them. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation."); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").[1]

---

[1] In reply, respondent asserts that he has not waived any arguments that he may assert on appeal. Docket No. 47 at 2 n.3. Respondent does not challenge, however, that the instant motion is limited to the Court's habitual residence determination.

### *1. Likelihood of Success on the Merits*

To satisfy the first factor, it is "not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 434 (citation omitted). Moreover, a party seeking a stay pending appeal may not simply "attempt to re-hash the same argument(s)" that the party made previously, which "does not demonstrate a likelihood of success on appeal." *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 423 F. Supp. 3d 1066, 1073 (D. Colo. 2019) (citing *Mainstream Mktg. Servs., Inc. v. F.T.C.*, 284 F. Supp. 2d 1266, 1275 (D. Colo. 2003)).

Respondent argues that he has a strong likelihood of success on the merits because the Court erred in finding that A.M.B.D.'s habitual residence before her removal to the United States was Romania. Docket No. 34 at 5. Respondent believes that the Court should have found that petitioner unilaterally changed her intent and that A.M.B.D.'s habitual residence was the United States because the parties had a shared intent to return to Colorado after A.M.B.D.'s birth. *Id.* at 6–7.

As the Court noted previously, "[t]he Hague Convention does not define the term 'habitual residence.'" Docket No. 27 at 8 (quoting *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020)); *see also Pope ex rel. T.H.L-P v. Lunday*, 835 F. App'x 968, 971 (10th Cir. 2020) (unpublished); *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004). "A child 'resides' where she lives. Her residence in a particular country can be deemed 'habitual,' however, only when her residence there is more than transitory." *Monasky*, 140 S. Ct. at 726 (citation omitted). "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* "No single fact . . . is

dispositive across all cases." *Id.* at 728. Ultimately, the question is, "[w]as the child at home in the particular country at issue?" *Id.* at 730.

Respondent's argument is essentially that the Court should have afforded more weight to the parties' shared intent before A.M.B.D. was born, an intent that the Court found was to return to the United States. Docket No. 34 at 6–9; *see also* Docket No. 27 at 12. The parents' shared intent used to be of paramount importance in the habitual residence analysis. Docket No. 27 at 9–10. Courts would generally first "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared." *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005); *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (en banc); *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) ("Before *Monasky*, the Fifth Circuit adopted an approach that looked to the parents' 'shared intent' as a threshold test for determining a child's habitual residence."). In determining intent, courts look at "actions as well as declarations." *Gitter*, 396 F.3d at 134.

The Court explained, however, that shared intent is no longer dispositive after *Monasky*. Docket No. 27 at 9–10. *Monasky* explained, "if the parents' actual agreement on where to raise their child were necessary to establish a habitual residence, that 'would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected.'" *Pope*, 835 F. App'x at 970–71 (quoting *Monasky*, 140 S. Ct. at 728). Therefore, "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's

residence in that place has the quality of being 'habitual.'" *Monasky*, 140 S. Ct. at 729.

The Court considered the parties' shared intent as one factor – though not a dispositive factor – in determining A.M.B.D.'s habitual residence and found that the parties' intent and conduct after A.M.B.D. was born outweighed their intent before her birth. Docket No. 27 at 18–19. The Court considered, among other factors, the length of time that the parties stayed in Romania; their actions while in Romania, including purchasing clothing for A.M.B.D., a bicycle, a safe, a washing machine, and a car; and the conditional six-month consent that petitioner provided to respondent to travel to the United States. *Id.* at 13. The Court found that these actions outweighed an intent formed before the child was born. *Id.*

While respondent believes that the Court should have afforded greater weight to the parties' intentions when they were living in Colorado before A.M.B.D. was born, respondent has failed to demonstrate that the Court's affording greater weight to the parities' more recent intent and conduct constituted clear error. *See Monasky*, 140 S. Ct. at 730 ("The habitual-residence determination thus presents a task for factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court."). Respondent has therefore failed to show that he has a strong likelihood of success on the merits, as it is "not enough that the chance of success on the merits be 'better than negligible.'" *See Nken*, 556 U.S. at 434 (citation omitted). Moreover, the Court finds that many of the arguments that respondent makes in his motion re-hash arguments that he made previously, which is insufficient to support a strong likelihood of success on appeal. *See Suncor Energy*,

423 F. Supp. 3d at 1073.[2]  This factor, therefore, weighs against a stay.

### 2. Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation and quotation omitted).  "Irreparable harm is not harm that is 'merely serious or substantial.'" *Id.* (citation omitted).  The Tenth Circuit has held that it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm" because "such losses are compensable by money damages." *Id.*  Nor may a party "simply show[] some 'possibility of irreparable injury.'" *Nken*, 556 U.S. at 434–35 (citation omitted).

Respondent argues that, without a stay, he will be "forced to incur the substantial costs of purchasing plane tickets to Romania (on short notice) for A.M.B.D. and an adult to travel with her, given her young age."  Docket No. 34 at 10.  The Court does not afford great weight to this argument, as respondent's purported injury may be cured with money damages on appeal. *Heideman*, 348 F.3d at 1189.  Nor does the Court find convincing respondent's argument that he must purchase plane tickets on short notice.  Respondent knew of the possibility that the Court would order A.M.B.D. to be returned

---

[2] Respondent argues that the Court should have held petitioner to a higher burden after the Court determined that the parties lacked a settled intent to abandon A.M.B.D.'s prior habitual residence for a new one.  Docket No. 34 at 9.  Respondent relies on *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013), and *Darin v. Olivero-Huffman*, 746 F.3d 1, 11 (1st Cir. 2014).  It is not clear precisely what respondent means, as the Court found that plaintiff established the elements of the *prima facie* case by a preponderance of the evidence, as required by 22 U.S.C. § 9003(e)(1)(A).  Regardless, the Court does not find this argument convincing in light of *Monasky*'s rule that no one factor is dispositive and that the Court should not weigh one factor, like the parties' shared intent, more heavily than another.  *See Monasky*, 140 S. Ct. at 727–29.

to Romania as early as July 2, 2021, when the petition was filed, and knew with certainty by September 15, 2021, when the Court ordered A.M.B.D. returned. Moreover, although the Court found that respondent's employment history was not stable or consistent, respondent did not testify that he had attempted to find paying work and the Court found that he decided against working during the ten-month period that he was in Romania. See Docket No. 27 at 1, 12–13, 29. Moreover, it is not clear if respondent had a paying job or looked for one when the parties lived in Colorado before A.M.B.D.'s birth, given his vague testimony that he "worked on a van." Id. at 1.

Respondent argues that he will suffer "extreme emotional harm in being separated from A.M.B.D." and that A.M.B.D. will suffer harm in being separated from respondent because he has been her primary caretaker since birth. Docket No. 34 at 10. As an initial matter, respondent identifies no different or additional harm than what he identified at the hearing. He may not simply repeat arguments made previously. See Suncor Energy, 423 F. Supp. 3d at 1073. While respondent claims that he has been A.M.B.D.'s primary caretaker since birth, the Court previously found that the parties shared parenting responsibilities equally while in Romania. Docket No. 27 at 2. The Court also is not persuaded that respondent will be irreparably injured absent a stay. Contrary to respondent's contention that return of A.M.B.D. would diminish the Tenth Circuit's power to return A.M.B.D. if respondent's appeal is successful, see Docket No. 34 at 10–12, the Supreme Court has explained that returning a child abroad does not render a respondent's claims moot. See Chafin v. Chafin, 568 U.S. 165, 180 (2013); see also Saada v. Golan, 2021 WL 1176372, at *7 (E.D.N.Y. Mar. 29, 2021).

Additionally, as respondent is a dual United States and Romanian citizen, he may travel freely to Romania and participate in a custody determination there. Any harm that respondent may suffer from this matter proceeding through "the ordinary processes of administrative and judicial review," *see Nken*, 556 U.S. at 427, is therefore diminished. The Court finds that this factor weighs against a stay.

### 3. Whether Other Parties Would be Substantially Injured by a Stay

Respondent argues that issuing a stay pending appeal will not substantially injure petitioner because the Court found that A.M.B.D. has been doing well in Colorado. Docket No. 34 at 11–12 (citing Docket No. 27 at 27). Respondent conflates injury to A.M.B.D. with injury to petitioner. While the Court agrees with respondent that A.M.B.D. may not be greatly harmed by staying in Colorado during the appeal, the same cannot be said of petitioner, whose custody rights have been continuously violated since December 31, 2020, when A.M.B.D. was wrongfully retained away from her home. The Court also notes that A.M.B.D.'s apparent comfort in Colorado is not sufficient to show that she is "at home" here. Moreover, she has been without her mother for nearly one year. *See Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998). If the Court's order is affirmed after a stay is granted, A.M.B.D. will have lost "precious months when she could have been readjusting to life in her country of habitual residence." *See Chafin*, 568 U.S. at 178.

In his affidavit, respondent states that, "[i]f granted a stay is in these proceedings pending appeal, [he is] willing to facilitate daily contact between [p]etitioner and A.M.B.D." Docket No. 34-1 at 4; *see also* Docket No. 47 at 8. He also states that, "[i]f

10

granted a stay is in these proceedings, [he is] willing to allow [p]etitioner to see A.M.B.D. if she travels to the United States for a visit." Docket No. 34-1 at 4; *see also* Docket No. 47 at 8. Petitioner's response states that respondent has restricted her access to A.M.B.D. to one daily FaceTime call at 4:00 a.m. Romanian time. Docket No. 46 at 6–7. Respondent confirms this in his reply. Docket No. 47 at 7–8. The Court is troubled by respondent's suggestion that he may bargain for petitioner's access to A.M.B.D. while an appeal is pending, given that the Court determined that respondent has wrongly retained A.M.B.D. away from her home and that Romanian law affords petitioner equal parenting rights that have been violated. Docket No. 27 at 23–24. The Court also found that neither respondent nor his family have made any effort at helping petitioner obtain a green card or have taken A.M.B.D. to visit petitioner in Romania. *Id.* at 6. The Court finds that this factor weighs against a stay and notes that appellate courts adjudicate appeals under the Hague Convention expeditiously. *See, e.g.*, *Gil-Leyva v. Leslie*, No. 17-cv-01406-KLM, 2018 WL 10322068, at *2 (D. Colo. June 12, 2018).

### 4. Public Interest

"[T]he public interest, as relevant to a Hague Convention dispute, is primarily defined by the treaty itself, the express purpose of which is 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" *Hofmann v. Sender*, 2012 WL 8466673, at *1 (S.D.N.Y. Dec. 20, 2012) (quoting Hague Convention on the Civil Aspects of International Child Abduction, Art. 1). "The aim of the Convention is to secure prompt return of the child to the correct jurisdiction, and any

unnecessary delay renders the subsequent return more difficult for the child, and subsequent adjudication more difficult for the foreign court." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 211 (E.D.N.Y. 2010), *aff'd*, 401 F. App'x 567 (2d Cir.) (unpublished) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996)).  Outside of the Hague Convention context, the public interest is furthered by the timely conclusion of legal disputes.  *Suncor Energy*, 423 F. Supp. 3d at 1075.

Respondent acknowledges that there is a public interest in the expeditious return of a child, yet claims that the expeditious appeal timeline favors a stay.  Docket No. 34 at 12.  To the extent respondent believes that the Court should maintain the status quo because the Tenth Circuit will act quickly, the Court does not find respondent's contention to outweigh the Convention's purpose of securing the prompt return of wrongfully removed or retained children.

Respondent also argues that keeping A.M.B.D.'s environment stable pending the appeal is in the public interest.  While A.M.B.D.'s stability is important, the Court's must not engage in a "best interest of the child inquiry," *see Dawson v. Dylla*, No. 21-cv-00283-RBJ, 2021 WL 1534608, at *4 (D. Colo. Apr. 19, 2021), and the public interest more strongly cautions against further delay of A.M.B.D.'s return to her habitual residence.  Moreover, "[a] removing parent must not be allowed to abduct a child and then – when brought to court – complain that the child has grown used to the surroundings to which they were abducted.  Under the logic of the Convention, it is the abduction that causes the pangs of subsequent return."  *Lukic v. Elezovic*, 2021 WL 804384, at *3 (E.D.N.Y. Mar. 3, 2021) (quoting *Friedrich*, 78 F.3d at 1068).

Respondent invokes the risks of travel with a child who is not vaccinated against COVID-19 as a reason to grant a stay. Docket No. 34 at 14. While the Court is cognizant of the risks of travel during the pandemic, these concerns do not appear to have dissuaded respondent from traveling with A.M.B.D. to the United States during the pandemic, before the availability of vaccines, and petitioner states that respondent may have traveled domestically with A.M.B.D., which undercuts respondent's arguments that he is worried about traveling during the pandemic. *See* Docket No. 46 at 8. Nor did respondent cite fear of COVID-19 as a reason that he retained A.M.B.D. in the United States beyond December 31, 2020. Where, as here, there is no evidence in the record addressing whether COVID-19 presents a risk to the child's health if the child is returned, courts have been reluctant to rely on COVID-19 to guide their decisions. *See, e.g.*, *In re ICJ*, — F.4th —, 2021 WL 4187853, at *8 (9th Cir. 2021) (holding that district court erred in implicitly considering "grave risk" COVID-19 without support in the record); *Filho v. de Albuquerque*, No. 20-cv-01421-RBJ, 2020 WL 9455201, at *9 (D. Colo. Aug. 21, 2020) (rejecting "grave risk" defense based in part on argument that Colorado was safer than Brazil during the pandemic where there was no support of that assertion, and "[t]he Court has no basis to speculate that reasonable and necessary precautions will not be taken to protect [the child] from the virus upon her return to Brazil"); *Chambers v. Russell*, 2020 WL 5044036, at *14 (M.D.N.C. Aug. 26, 2020) (holding "COVID-19 does not satisfy the Grave-Risk Defense"); *see also Nunez v. Ramirez*, 2008 WL 898658, at *5 (D. Ariz. Mar. 28, 2008) ("[p]roof of grave risk of harm requires 'specific evidence of potential harm' to children" (quoting *Rydder v. Rydder*, 49

F.3d 369 (8th Cir. 1995))).

Finally, respondent argues that a stay is necessary to prevent inconsistent judicial decisions that could result if the Romanian divorce proceedings continue and respondent is successful in his appeal. Docket No. 34 at 13–14. Respondent appears to misunderstand the purpose of the Convention and the Court's order. As the Court explained, the Court does not consider the merits of the underlying custody dispute. Docket No. 27 at 7 (citing *Watts*, 935 F.3d at 1141; *Seaman*, 766 F.3d at 1257; *de Silva*, 481 F.3d at 1285 n.6 (quoting *Gaudin*, 415 F.3d at 1035)). Therefore, there will not be any inconsistency with a Romanian court's custody determination, regardless of whether the Court grants respondent's motion or the Tenth Circuit affirms or reverses the Court's order that respondent return A.M.B.D. Respondent's reliance on *Navani v. Shahani*, 496 F.3d 1121, 1130 (10th Cir. 2007), is therefore misplaced. In *Navani*, the court noted that it lacked jurisdiction to determine the parties' custody rights, which were decided by an English court, *id.*, which is consistent with the Court's September 15 order on the petition. This factor weighs against granting a stay.

Because respondent has failed to establish (1) a strong likelihood of success on the merits, (2) that he would suffer irreparable injury absent a stay, (3) that petitioner would not be substantially harmed by a stay, (4) or that the public interest supports granting a stay, the Court will deny petitioner's motion.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that respondent's Emergency Motion for Stay Pending

Respondent's Appeal [Docket No. 34] is **DENIED**.

DATED October 19, 2021.

BY THE COURT:

_____
PHILIP A. BRIMMER
Chief United States District Judge